FLORAL TRADE COUNCIL, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Government of Colombia, and Asociacion Colombiana de Exportadores de Flores, Defendant–Intervenors.

Slip Op. 97–176.
Court No. 96–09–02281.

United States Court of International Trade.

Dec. 18, 1997.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer, and Mara M. Burr), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (John K. Lapiana), for defendant.

Arnold & Porter (Michael T. Shor), for defendant-intervenors.

## *OPINION*

RESTANI, Judge.

Floral Trade Council ("FTC") appeals from the final results of the consolidated calendar year 1994 administrative reviews of two suspended countervailing duty investigations covering (1) roses and other cut flowers from Colombia, and (2) miniature carnations from Colombia. A single Federal Register notice was published by the United States Department of Commerce, International Trade Administration ("ITA"). *See Roses and Other Cut Flowers from Colombia; Miniature Carnations from Colombia,* 61 Fed.Reg. 45,941, 45,941 (Dep't Commerce 1996) (final results of admin. rev.) [hereinafter *"Final Results "*]. In the *Final Results,* ITA terminated both suspended investigations after concluding (i) that no countervailable benefits had been provided for a period of at least five years, and (ii) that it is likely that Colombian producers and exporters of flowers will not receive any net subsidy in the future. *Id.* ITA defends the *Final Results.* The Government of Colombia ("GOC") and Asociacion Colombiana de Exportadores de Flores ("Asocolflores"), an organization of Colombian flowers exporters and importers, and various of its members, have intervened in support of the *Final Results.*

While all past agency determinations related to this case are governed by the prior statute, the administrative review covering the period of review ("POR") from January 1, 1994 to December 31, 1994 was initiated after January 1, 1995 and is therefore governed by the statute as amended by the Uruguay Round Agreements Act.[1] Under the current statute, ITA is authorized to suspend a countervailing duty investigation if:

exporters who account for substantially all of the imports of the subject merchandise agree—

(1) to eliminate the countervailable subsidy completely or to offset completely the amount of the net countervailable subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended....

19 U.S.C. § 1671c(b)(1) (1994).

ITA's regulations also provide for the termination of suspended investigations under certain circumstances. Specifically, ITA's regulations provide that it may terminate a suspended investigation if it concludes that:

(i) All producers and exporters covered at the time of revocation by the order or the suspension agreement have not applied for or received any net subsidy on the merchandise for a period of at least five consecutive years; and

(ii) It is not likely that those persons will in the future apply for or receive any net subsidy on the merchandise from those programs the Secretary has found countervailable in any proceeding involving the affected country or from other countervailable programs.

19 C.F.R. § 355.25(a)(2)(i)-(ii) (1995).

### *FACTS*

#### A. Background

On August 6, 1982, U.S. producers of fresh cut flowers other than miniature carnations filed a petition seeking a countervailing duty investigation of Colombian producers and exporters of fresh cut flowers other than miniature carnations. *See Roses and Other Cut Flowers from Colombia,* 47 Fed.Reg. 50,314, 50,314 (Dep't Commerce 1982) (prelim.determ.). In a preliminary determination issued on November 5, 1982, ITA found that

---

1. The amendments to the countervailing and antidumping law by the Uruguay Round Agreement Act shall take effect on and apply to:
   (a) In General.—
   ...
   (2) reviews initiated under section 751 [19 U.S.C. § 1675] of such Act—
   (A) by the administering authority or the Commission on their own initiative after such date, or

(B) pursuant to a request filed after such date,
   ...
   (b) Date Described.—The date described in this subsection is the date on which the WTO Agreement ... enters into force with respect to the United States [January 1, 1995].
   19 U.S.C. § 1671 (1994)(note); *see also* Pub.L. 103–465, section 291.

Colombian producers received countervailing benefits under one program—the Tax Reimbursement Certificate Program, an export reimbursement program, then known as the CAT program. *Id.* at 50,315.

On January 18, 1983, ITA entered into a suspension agreement with individual Colombian producers and exporters of roses and other fresh cut flowers, excluding miniature carnations, which producers and exporters comprised over 85% of total exports of subject flowers to the United States. *Roses and Other Cut Flowers from Colombia,* 48 Fed. Reg. 2158, 2161 (Dep't Commerce 1983) (suspension of investigation) [hereinafter *"Roses Agreement "*]. The producers and exporters agreed not to "apply for or receive any benefits that the Department has determined or determines to be countervailable under the Tax Reimbursement · Certificate Program (CAT) with respect to exports of the subject product entering the United States." *Id.* (¶ B.a). The exporters also agreed not to "apply for or receive benefits under any· other program subsequently determined by the Department in this or any subsequent proceeding concerning other merchandise from Colombia to constitute bounties or grants under the Act." *Id.* (¶ B.b).

Following a later countervailing duty investigation concerning certain textile mill products and apparel from Colombia, in which ITA found other Colombian government programs to constitute bounties or grants, ITA and Colombian exporters, on December 15, 1986, entered into a revised suspension agreement. *Roses and Other Cut Flowers from Colombia,* 51 Fed.Reg. 44,930, 44,932 (Dep't Commerce 1986) (final results of admin. rev. and revised suspension agmt.) [hereinafter *"Revised Roses Agreement "*].

The revised agreement provides in pertinent part the following. First, the signatories reaffirmed their agreement not to apply for or receive benefits under the CAT program, known now as the CERT program. *Id.* (¶ II.a).

Second, the producers agreed not to apply for or receive any short-term or long-term export loans provided by the Colombian Gov-ernment Export Promotion Fund ("PROEXPO") "other than those offered on non-preferential terms at or above the most recent long-term [short-term] benchmark interest rate determined by the Department in this proceeding." *Id.* at 44,933 (¶¶ II.c & b). Unlike the CAT/CERT program and other programs included in the revised agreement which the signatories agreed to renounce entirely, the signatories did not agree to refuse Colombian government loans. Instead, the signatories agreed to have ITA periodically set benchmark interest rates, and to ensure that PROEXPO loans, when issued, were at rates at or above the benchmark rates then in effect.[2] *Id.* The initial benchmark interest rates were set at 22.5% for short-term loans and 21% for long-term loans. *Revised Roses Agreement,* 51 Fed. Reg. at 44,932. These rates were based not on commercial bank interest rates, but rather, constituted the average interest rates then available under non-targeted governmental financing programs for the Colombian agricultural sector as a whole. *See id.* at 44,931–32.

On June 17, 1986, at the request of the FTC, ITA initiated an independent countervailing duty investigation into miniature carnations from Colombia. *Miniature Carnations from Colombia,* 51 Fed.Reg. 21,960, 21,960 (Dep't Commerce 1986) (initiation). ITA issued a preliminary determination on October 27, 1986, finding subsidies in the amount of 1.09% *ad valorem* under the PROEXPO loan program and one other program. *See Miniature Carnations from Colombia,* 51 Fed.Reg. 37,934, 37,934 (Dep't Commerce 1986) (prel.determ.). No subsidies were found under the CERT program, as the GOC had set the rebate rate applicable to all flower exports to the United States to zero on October 29, 1985. *Id.* at 37,935.

On January 13, 1987, ITA entered into a suspension agreement with Colombian producers and exporters of miniature carnations from Colombia. *See Miniature Carnations from Colombia,* 52 Fed.Reg. 1353, 1354 (Dep't Commerce 1987) (suspension of in-

---

**2.** The agreement also contained an obligation for producers to refinance all preexisting loans at or above the new benchmark interest rates. *Id.* (¶¶ II.b & c).

vest.) [hereinafter *"Carnations Agreement"*]. The terms of the *Carnations Agreement* were virtually identical to those of the *Revised Roses Agreement*. The only material difference relevant here is that the *Carnations Agreement* contains a cross-reference to the *Revised Roses Agreement* with respect to benchmark interest rates under the PROEXPO loan program. *Id.* at 1355. Specifically, the *Carnations Agreement* provides that signatories will not receive PROEXPO loans "other than those offered at non-preferential terms and at or above the most recent short-term [long-term] benchmark interest rate determined by the Department in this proceeding or the countervailing duty proceeding on roses and other cut flowers from Colombia." *Id.* (¶¶ II.B & C).

Pursuant to its regulations, ITA conducted annual reviews of the suspension agreements whenever requested to do so by an interested party and consistently found that the signatories complied with all obligations under both agreements.[3] Furthermore, the only program covered by the suspension agreements that was not abolished for flower growers was the PROEXPO loan program.[4] *See, e.g., 1988–90 Carnations Review,* 59 Fed.Reg. at 10,791. The GOC took various steps to further compliance.

For example, in December 1987, PROEXPO modified its loan program. Instead of providing loans at fixed rates of interest, PROEXPO begin issuing only variable rate loans tied to the market rate for 90–day certificates of deposit—the "DTF rate"[5]—on

the date a loan was issued. *See Roses and Other Cut Flowers from Colombia,* 54 Fed. Reg. 51,052, 51,052–03 (Dep't Commerce 1989) (prel.results); *Miniature Carnations from Colombia,* 54 Fed.Reg. 51,050, 51,050 (Dep't Commerce 1989) (prel.results).

In the administrative reviews covering 1987, FTC made no request that ITA modify its benchmark interest rates. *See 1987 Carnations Review,* 55 Fed.Reg. at 5042; *1986–87 Roses Review,* 55 Fed.Reg. at 5043. During 1988, the benchmarks thus remained at 21% and 22.5% for long-term and short-term loans, respectively. The actual rates for PROEXPO loans to flower growers, however, were higher. For short-term loans, flower growers received loans at the higher of 22.5% or the DTF rate. *Miniature Carnations from Colombia,* 55 Fed.Reg. 33,341, 33,342 (Dep't Commerce 1990) (prelim.results); *Roses and Other Cut Flowers from Colombia,* 55 Fed.Reg. 33,343, 33,344 (Dep't Commerce 1990) (prelim.results). ITA found that the DTF rate during 1988 averaged 28.4%. *1988 Carnations Review,* 55 Fed.Reg. at 53,583; *1988 Roses Review,* 55 Fed.Reg. at 53,585. With respect to long-term loans, flower growers were eligible to receive loans at the higher of 25% or the DTF rate. *1988 Roses Review,* 55 Fed.Reg. at 53,583; *1988 Carnations Review,* 55 Fed.Reg. at 53,584. FTC did not object to ITA's finding that no net subsidy had been conferred in 1988, nor did it request that ITA change the benchmark interest rates.

---

3. *See, e.g., Roses and Other Cut Flowers from Colombia; Miniature Carnations from Colombia,* 61 Fed.Reg. 9429 (Dep't Commerce 1996) [hereinafter *"1993 Final Results"*]; *Roses and Other Cut Flowers from Colombia; Miniature Carnations from Colombia,* 60 Fed.Reg. 42,539 (Dep't Commerce 1995) [hereinafter *"1991–92 Final Results"*]; *Roses and Other Cut Flowers from Colombia,* 59 Fed.Reg. 10,796 (Dep't Commerce 1994) [hereinafter *"1988–90 Roses Review"*]; *Miniature Carnations from Colombia;* 59 Fed. Reg. 10,790 (Dep't Commerce 1994) [hereinafter *"1988–90 Carnations Review"*]; *Miniature Carnations from Colombia,* 56 Fed.Reg. 14,240 (Dep't Commerce 1991) [hereinafter *"1989 Carnations Review"*]; *Miniature Carnations from Colombia,* 55 Fed.Reg. 53,583 (Dep't Commerce 1990) [hereinafter *"1988 Carnations Review"*]; *Roses and Other Cut Flowers from Colombia,* 55 Fed.Reg. 53,584 (Dep't Commerce 1990) [herein-

after *"1988 Roses Review"*]; *Roses and Other Cut Flowers from Colombia,* 55 Fed.Reg. 5042 (Dep't Commerce 1990) [hereinafter *"1986–87 Roses Review"*]; *Miniature Carnations from Colombia,* 55 Fed.Reg. 5042 (Dep't Commerce 1990) [hereinafter *"1987 Carnations Review"*].

4. The PROEXPO program was not abolished because signatories had not agreed to renounce loans, only to renounce loans on preferential terms or at rates below ITA benchmarks. *See id.* at 10,794–95. ITA, however, expressly determined that the CERT program had been abolished for flower exports to the United States. *See, e.g., 1988–90 Carnations Review,* 59 Fed.Reg. at 10,792.

5. The DTF functions like the U.S. prime rate, and is used by banks in setting loan rates.

For calendar year 1989, FTC requested a review only of the *Carnations Agreement.* Loans to flower growers were still provided at the higher of 22.5% or the DTF rate for short-term loans, and 25.0% or the DTF rate for long-term loans. *1989 Carnations Review,* 56 Fed.Reg. at 14,240; *Miniature Carnations from Colombia,* 55 Fed.Reg. at 50,-246. Because the DTF rate averaged 27.9% in 1989, ITA determined that the signatories had fully complied with their obligations, and that no net subsidy was conferred. *Miniature Carnations from Colombia,* 55 Fed.Reg. at 50,346.

Moreover, ITA determined that the preexisting benchmarks were no longer appropriate because interest rates for the alternative sources of financing ITA used to compute the benchmark rates had changed. *1989 Carnations Review,* 56 Fed.Reg. at 14,240. Thus, effective April 8, 1991, ITA changed the benchmark interest rate to DTF plus 1 percentage point for short-term loans, and DTF plus 1 plus 0.25 percentage points for each additional year after the first year, for long-term loans. *Id.* ITA expressly stated that the new rates "will apply to loans granted after the date of publication of this notice." *Id.* FTC filed no comment with ITA on any issue in the review, nor did it appeal from any aspect of the determination.

Because the *Revised Roses Agreement* did not contain a crossbenchmark clause similar to that contained in the *Carnations Agreement,* the new benchmarks established under the miniature carnations agreement did not apply under the roses agreement. Nonetheless, it appears the GOC applied the new benchmark rates for *all* flower growers. *See Asociacion Colombiana de Exportadores de Flores v. United States,* Slip Op. 95–59, at 8–9, 1995 WL 170396, at *4 (Ct. Int'l Trade 1995) [hereinafter *"Asocolflores"*].

**B. 1990 Review Period**

In the 1990 administrative reviews, the GOC requested termination of the two suspension agreements. *1989–90 Carnations Review,* 59 Fed.Reg. at 10,790 (including comments on issues relating to both the roses and carnations reviews); *1988–90 Roses Review,* 59 Fed.Reg. at 10,796 (limited to case specific comments). Pursuant to ITA's

regulations, the government of a foreign country may request termination of a suspended investigation if, *inter alia,* it can demonstrate that it has abolished all programs previously found to be countervailable for a minimum of three years. 19 C.F.R. §. 355.25(b)(1) (1995). ITA found that the CERT program had been abolished for subject merchandise for at least three years. *1988–90 Carnations Review,* 59 Fed.Reg. at 10,791. But, with respect to the PROEXPO loan program, although ITA found that for a three year period the program did not confer any countervailable benefits, it determined that "the program has not been abolished." *Id.* Instead, ITA determined that "the above scenario characterizes non-use of the program." *Miniature Carnations from Colombia,* 58 Fed.Reg. at 52,278; *Roses and Other Cut Flowers from Colombia,* 58 Fed.Reg. at 52,273.

In the 1990 review, FTC argued that ITA should not evaluate the PROEXPO loan program using the benchmark interest rates provided for in the suspension agreements. *1988–90 Carnations Review,* 59 Fed.Reg. at 10,794. Instead, FTC argued that ITA should use the annual average interest rates for commercial loans during the POR. *Id.* ITA reaffirmed its conclusion from the 1989 miniature carnations review that suspension agreements are prospective and that the interest rate benchmarks contemplated by the agreements "cannot [be] reset . . . in the middle of an administrative review. . . . Since suspension agreements are forward looking, the terms and conditions should not be retroactively changed during the POR." *1988–90 Carnations Review,* 59 Fed.Reg. at 10,795. ITA confirmed that "because all PROEXPO loans were above the benchmark rates, . . . the GOC did not confer any countervailable benefits through the PROEXPO program during the POR." *Id.* FTC did not, however, request any prospective changes in the benchmark rates, and none were made.

The GOC appealed ITA's determination not to terminate the suspended investigations, but this court affirmed ITA's decision in *Asocolflores,* Slip Op. 95–59, at 13, 1995 WL 170396, at *5. In its decision, the court stated that "[d]uring the period of review,

the interest rates on all PROEXPO loans to flower growers and exporters were significantly higher than required under the agreements." *Id.* at 9, 1995 WL 170396, at \*4. The court also noted that the GOC had amended the PROEXPO governing resolutions applying the suspension agreements' minimum rates to all flower growers. *Id.* But, the court found that it was not clear whether the floor loan rate would float with the rate provided in the suspension agreements as updated, "in which case no subsidies could be given under the program." *Id.* The court did not need to resolve this issue, however, because it upheld ITA on the basis that a program not relevant here was not abolished in time to qualify for termination under the relevant regulation. *Id.*

### C. 1991 and 1992 Review Periods

ITA conducted administrative reviews of both agreements for the 1991 and 1992 time periods, which reviews it consolidated. *1991–92 Final Results,* 60 Fed.Reg. at 42,539. By this time, PROEXPO had been converted into a government-owned bank called BANCOLDEX. *Id.* at 42,543. ITA verified that all signatories had complied with the terms of the suspension agreements by receiving only non-preferential loans at or above the applicable benchmark interest rates. *Id.* at 42,545. In addition, ITA found that BANCOLDEX had begun issuing loans in dollars. *Id.* at 42,543. ITA therefore established benchmark interest rates for such dollar loans, even though it never found the program to confer a countervailable subsidy. *Id.* In any event, it appears the benchmark rate established was lower than the rate then in effect for BANCOLDEX dollar loans. *See id.* at 42,544; *Roses and Other Cut Flowers from Colombia; Miniature Carnations from Colombia,* 59 Fed.Reg. at 52,515.

FTC contested several aspects of ITA's preliminary determination. First, FTC contested ITA's finding that the signatories had complied with their obligation to renounce the OAT/CERT program. *1991–92 Final Results,* 60 Fed.Reg. at 42,540. Relying upon a disclosure by the GOC that it had in 1992 eliminated the CERT program for all exports to Panama and the Netherlands An-

tilles due to instances of fraud in claiming such rebates in non-flower programs, FTC claimed ITA could not be sure that no CERT rebates were received by flower growers for exports to the United States. *Id.* ITA rejected FTC's arguments as unsupported by any record evidence. *Id.* at 42,541. It noted that CERT payments had been set to zero for exports of flowers to the United States. *Id.* It further noted that ITA "fully verified the non-receipt of CERT payments on exports of the subject merchandise by reviewing the Central Bank's CERT printouts by destination." *Id.* at 42,539, 42,541. Further, ITA verified exports of subject flowers to Panama and the Netherlands Antilles to ensure that *bona fide* exports occurred. *Id.* ITA concluded that the GOC and the flower growers/exporters were in compliance with the suspension agreements during the PORs. *Id.*

Second, FTC again objected to ITA's use of the benchmark interest rates provided for in the agreements. *Id.* at 42,541. Once again, FTC requested that ITA calculate a "current" benchmark interest rate for the POR, and evaluate individual loans against that rate. *Id.* For the same reasons as in prior reviews, ITA again rejected this approach as inconsistent with the terms of the suspension agreements, and unworkable in the context of suspension agreements generally. *Id.* FTC did not appeal this final determination.

ITA, however, adjusted the benchmark interest rates for Colombian peso loans as a result of the review, to account for changes in the agricultural lending rates. *See id.* at 42,542. The new rates, effective as of August 30, 1995, were DTF plus 3.66 percentage points for short-term loans and DTF plus 3.66 percentage points, plus an additional 0.25 percentage point for each year after the first, for long-term loans. *Id.*

### D. 1993 Review Period

Reviews were requested for both agreements for the 1993 period. Again ITA determined that the signatories had complied with all obligations under the suspension agreement, both with respect to BANCOLDEX loans and with respect to the CERT program, and had received no countervailable

benefits. *1993 Final Results*, 61 Fed.Reg. at 9429. ITA modified the benchmark for long-term dollar loans, made no changes to the peso benchmarks, and expressly stated that "[l]oans provided at or above the benchmark will not be considered preferential." *Id.* at 9433.

FTC again asserted that ITA could not be certain no CERT rebates were paid with respect to flower exports to the United States. *Id.* at 9430. Again, ITA noted that it conducted a full verification of company and government records, and found no evidence of any CERT rebates for flowers exported to the United States. *Id.* Also, FTC raised its argument about the benchmark interest rates, which ITA again rejected for all the reasons it had stated in prior reviews. *Id.* at 9431–32.

Asocolflores appealed from the *1993 Final Results*, which contained a statement by ITA suggesting that all preexisting dollar loans issued in conformity with the agreements would have to be refinanced at new rates.[6] *Id.* at 9432. ITA agreed that the language to which Asocolflores objected was wrong and had been inadvertently included, and requested a voluntary remand to correct the final results. The court remanded, and ITA ruled that "[t]here is no requirement in the suspension agreements for respondents to refinance loans which the Department has found, in previous review periods, to be in compliance with the benchmarks in effect at the time of issuance of the loans." *Results Regarding Asociacion Colombiana de Exportadores de Flores v. United States, Court No. 95–08–01024, (July 15, 1996)*; GOC's App., Tab 5, at 1. The court affirmed ITA's remand determination without objection. *Asociacion Colombiana de Exportadores de Flores v. United States*, Ct. No. 95–04–01072 (Ct. Int'l Trade July 26, 1996) (final order); GOC's App., Tab 5.

### E. 1994 Review Period

While the 1994 review was pending, the Colombian flower producers and exporters and BANCOLDEX agreed to establish a

mechanism to ensure that no subsidies could be provided to flower growers through BANCOLDEX loans in the future. Letter from Asocolflores to BANCOLDEX of 11/3/95, GOC's App., Tab 6; Letter from BANCOLDEX to Asocolflores of 11/10/95, GOC's App., Tab 6 (appendix A to GOC November 13, 1995 submission). Accordingly, at the request of Asocolflores, BANCOLDEX agreed to monitor dollar and peso interest rates, and to adjust the BANCOLDEX floor rates to ensure that subsidies were not conferred. Letter from BANCOLDEX to Asocolflores, GOC's App., Tab 6. The GOC also certified that it would institute or maintain appropriate measures to ensure that export loan programs would be administered so as not to confer countervailable subsidies on flower growers. GOC Certification Regarding BANCOLDEX (Feb. 9, 1996), at 3, GOC's App., Tab 7. As ITA verified, on November 14, 1995, BANCOLDEX increased the floor rate on loans to flower growers from DTF + 3.66 to DTF + 3.86, to conform to changes in agricultural loan rates, and also adjusted the dollar floor to conform to changes in U.S. interest rates. Verification Report (Feb. 28, 1986), at 9–10, GOC's App., Tab 7; BANCOLDEX Verification Ex. 7, GOC's App., Tab 7.

Before the ITA, FTC challenged generally ITA's findings with respect to the CERT rebates for flowers shipped to Panama and the Netherlands Antilles. *Final Results*, 61 Fed.Reg. at 45,942. FTC reiterated its argument that ITA had not investigated thoroughly enough to be certain that flower exporters had not received rebates with respect to their exports to the United States through fraudulent transshipment. *Id.*

ITA responded that "[p]etitioner's allegation concerning the 1991–92 period was examined by the Department during that review, and the Department found no evidence to support an allegation of transshipment or reshipment of the subject merchandise." *Id.* ITA further noted that there is no evidence in the current POR of any problems with respect to the CERT program. *Id.* Accord-

---

**6.** In the *1993 Final Results*, ITA added a heading, "Refinancing Outstanding Dollar and Peso Loans," and stated that respondents would have 90 days to repay or refinance any outstanding loans "to meet the new short and long-term dollar and peso benchmarks." *Id.* at 9434.

ingly, ITA did not commence an investigation in any third country in order to detect transshipment.

FTC also argued that ITA should not apply "outdated" benchmark interest rates to determine compliance with the suspension agreements. *Id.* at 45,944. FTC contended that to terminate the suspension agreements, ITA must compare BANCOLDEX interest rates to current interest rate benchmarks. *Id.* ITA once again noted that suspension agreements necessarily are forward looking, and that, under the terms of these agreements, ITA must set benchmark interest rates prospectively. *Id.*

Based upon its findings that all programs (except BANCOLDEX) had been abolished, that the signatories had complied with the agreement and received no subsidies for more than five years, and that it was unlikely flower growers would or could receive subsidies in the future, ITA terminated the suspended investigations on August 30, 1996. *Id.* at 45,941.

FTC now raises these two issues before the court. ITA and defendant-intervenors contend that the ITA's findings for the 1994 period of review are fully supported by the evidence and that the regulatory conditions for termination, which they allege are consistent with the statute, have been met.

### DISCUSSION

The overriding issue in this case is whether ITA may rely on its findings of no subsidization under the suspension agreements for the four prior periods of review in determining that the first prong of the termination test, i.e., five years of no subsidization, has been met. *See* 19 C.F.R. § 355.25(a)(2)(i). This issue involves both the CERT program and the BANCOLDEX loan program. It also effects the second prong of the test, the likelihood of future subsidization. *See* 19 C.F.R. § 355.25(a)(2)(ii). Also at issue are the results of the fifth and last period of review.

#### A. The CERT Program

ITA found as to the last period of review, 1994, that FTC presented no evidence of subsidization occurring under the CERT program. *Final Results,* 61 Fed.Reg. at 45,942. The GOC had certified that this program was abolished prior to the review period for all flowers exported to the United States, *id.,* and FTC does not appear to challenge seriously this finding. Also, while it may wish that ITA had conducted an investigation of fraud in the CERT program in 1994, there was no evidence relating to the 1994 period which would cause ITA to do so.

In prior years there was evidence of transshipment for some products which may or may not have included flowers. This caused the GOC in 1992 to terminate the CERT program for exports to Panama and the Netherlands Antilles. *1991–92 Final Results,* 60 Fed.Reg. at 42,540. Given its earlier verification, ITA found no basis for concluding that there was fraud in the CERT program for flowers exported to the United States. *Final Results,* 61 Fed.Reg. at 45,-942.

■ If the statute or regulations require ITA for purposes of termination of a suspended investigation to reexamine prior no subsidy years, despite the earlier, now final, findings that no subsidization occurred, remand would be required for this purpose because ITA did not undertake such a reexamination. The court, however, can find nothing in the statute or regulations which mandates this approach. Certainly, 19 C.F.R. § 355.25(a)(2)(i) does not state that ITA cannot rely on the results of prior reviews which have become final for all other purposes, and nothing in 19 U.S.C. § 1675 dictates such a result. If ITA was remiss in not investigating adequately the CERT program for fraud via transshipment through Panama and the Netherlands Antilles prior to the 1994 review, FTC should have pursued its administrative remedies and judicial review, if necessitated, at those times. The law does not mandate reexamination after the prior reviews have become final.

■ As to the *1994* review, which is now before the court, ITA was not required to investigate fraud in those aspects of the CERT program which were abolished in *1992,* i.e., shipments to the Netherlands An-

tilles and Panama. Further, there is simply nothing to support FTC's request for an investigation of any other country.[7] Accordingly, ITA's finding of no subsidization in the 1994 review period as to the CERT program, is sustained.

As there were at least five years of findings of no subsidization, the CERT program was abolished for exports of flowers to the United States, and there was no viable evidence of likelihood of future use of the program for flower exports to the United States, ITA properly found that as to the CERT program the requirements for termination of the suspended investigations were met.

### B. BANCOLDEX Loan Program

■ ITA evaluated the BANCOLDEX peso loan program under the subsidy criteria contained in the suspension agreements.[8] *Final Results,* 61 Fed.Reg. at 44,944. As indicated, the actual loan rates for 1994 were above those required by the suspension agreements. *Id.* FTC's argument is that compliance with the applicable suspension agreements is insufficient and that under 19 U.S.C. § 1675(c) and 19 C.F.R. § 355.25(a)(2)(i), ITA must find that no subsidization has occurred for five years, apart from the subsidy standard or benchmark contained in the suspension agreements.[9] Thus, FTC argues the actual loan rates must be compared to current commercial rates or rates which were otherwise generally available to the exporters.

■ This court never before has been presented with the issue of whether compliance with a suspension agreement which defines "no subsidization" is in fact "no subsidization" for purposes of the countervailing duty law in general and 19 C.F.R.

§ 355.25(a)(2)(ii) in particular. The purpose of suspension agreements, however, is to achieve a state of zero subsidization. They do this in the case of loan programs by establishing a benchmark which is based on an agreed upon floor rate to be applied thereafter. *See Asocolflores,* Slip Op. 95–59, at 8, 1995 WL 170396, at *4. The parties, of course, may seek amendments to the agreements if they do not achieve a reasonable standard for judging no subsidization. FTC offered ITA no reasonable alternative to prospectively applicable benchmarks for establishment of criteria in suspension agreements. Suspension agreements are inherently forward looking. *See, e.g., Certain Tool Steel Products from Brazil,* 51 Fed. Reg. 45,376, 45,379 (Dep't Commerce 1986) (final results and renegotiation of suspension agmt.)(CVD investigation suspended under export tax subject to prospective adjustment based on past subsidy rate); *Certain Stainless Steel Products from Japan,* 51 Fed.Reg. 45,371, 45,375 (Dep't Commerce 1986) (final results and renegotiation of suspension agmt.)(same). Thus, it is obvious that ITA has acted reasonably and within its discretion in defining zero subsidization prospectively for the purpose of the agreements themselves.[10]

The next issue is whether the yearly findings of no subsidization under the suspension agreements must be revisited in the context of termination of suspended investigations, so that respondents would be subjected up to five years later to a new retrospective standard for zero subsidization for purposes of the first prong of the termination test. FTC appears to concede that it lost the battle in previous years and that ITA's findings of compliance with the suspension agreements were, in essence, findings of no subsidization

---

**7.** After considerable prompting at oral argument, FTC offered Ecuador as a possible country of transshipment because it has substantial exports of flowers to the United States, but FTC cannot explain why the low CERT flower benefits would not be offset by the extra air freight. Of course, there are no specific allegations as to Ecuador.

**8.** The dollar loan program is not at issue.

**9.** FTC does not argue that the benchmarks were not supported by substantial evidence when established.

**10.** The court suggested at oral argument that because suspension agreements function prospectively, what FTC might have been asking for was a completely floating standard unrestricted by a numerical standard. FTC made it clear that it sought the "discipline" of a defined benchmark, which it then sought to set aside for purposes of judging compliance. The court fails to see how FTC can claim a floating standard and a defined standard at the same time.

for those years, which are now final. If FTC does not so concede, the court would, nonetheless, find this to be the case. FTC, however, may seek to establish for the 1994 POR that the no subsidization finding was in error, even though the agreement was met. It argues that ITA should have investigated whether loans in the POR were actually at or below contemporaneously available commercial loan rates. ITA rejected this approach as unworkable in the suspension agreement context. Respondents also argues that it would be unfair to apply shifting standards to its conduct. Once again, the statute gives little guidance. The regulation and the past practice of ITA leave room for ITA's approach in this regard.

Even though benchmarks are applied retrospectively in non-suspension agreement administrative investigations and reviews, it does not follow that the suspension agreement standard must be abandoned for purposes of a termination regulation expressly applicable to suspension agreement cases. ITA's approach makes sense for practical assessment of compliance and in terms of the policy of the statute of preventing subsidization. In terms of fulfillment of statutory purpose, any unusual fact situation which might give ITA pause as to the wisdom of termination because of subsidization revealed upon retrospective review could be handled through consideration of the likelihood of future subsidization. It does appear that the first prong of the regulatory test, 19 C.F.R. § 355.25(a)(2)(i), is meant to be somewhat rigid, while the second prong, 19 C.F.R. § 355.25(a)(2)(ii), which relates to future conduct, admits of broader discretion. In this case FTC's analysis of the loan data does not demonstrate the likelihood of subsidization from any perspective. Thus, ITA was not remiss in failing to apply FTC's retrospective benchmark analysis.

In terms of the practicalities of judging subsidization in this case, it should be noted that interest rates change. Here they were highly variable. At times the prospective aspects of suspension agreements may make such agreements more stringent for loan programs and, at other times, more lax. This is simply the result of the prospective nature of suspension agreements in general and the mutability of interest rates. Further, because the benchmark rates used in the most recent reviews, and to be used in the future, are themselves floating rates, the chances of distortion are minimal. Finally, it appears there was no subsidization even based on a retrospective analysis. That is, FTC could point to no record evidence of loans to flower exporters which were at more favorable rates than contemporaneous commercial or generally available loan rates. Thus, whether there is a case in which ITA might have reason to abandon its view that the compliance with the suspension agreements for five years is sufficient to satisfy 19 C.F.R. § 355.25(a)(2)(i), this is not such a case.

Accordingly, the court finds ITA properly concluded that no subsidization occurred in the BANCOLDEX program based on five years of findings of no subsidization under the suspension agreements and no evidence of likelihood of future subsidization.

### CONCLUSION

The court sustains ITA's determination that there was no subsidization in 1994 under either the CERT or the BANCOLDEX programs. ITA's determination that the requirements for termination of the investigation of Colombian flowers based on five years of zero subsidization and no future likelihood of subsidization were met is also sustained.

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

**IT IS HEREBY ORDERED:** that the ITA determination terminating suspended countervailing duty investigations is sustained.